# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Case No. 15-cr-128(1) (DWF/TNL) |
| Plaintiff, | |
| v. | **REPORT & RECOMMENDATION** |
| Rashad Arthur Russell, | |
| Defendant. | |

Thomas Calhoun-Lopez, Assistant United States Attorney, United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415 (for the Government); and

Reynaldo A. Aligada, Jr., Assistant Federal Defender, Office of the Federal Defender, 300 South Fourth Street, Suite 107, Minneapolis, MN 55415 (for Defendant).

This matter is before the Court, United States Magistrate Judge Tony N. Leung, on Defendant's Pretrial Motion to Suppress Fruits of Unlawful Arrest and Search and Seizure (ECF No. 17). This motion has been referred to the undersigned for a report and recommendation to the district court, the Honorable Donovan W. Frank, District Judge of the United States District Court for the District of Minnesota, under 28 U.S.C. § 636 and D. Minn. LR 72.1.

A hearing was held on June 17, 2015. Assistant United States Attorney Thomas Calhoun-Lopez appeared on behalf of the United States of America (the Government). Assistant Federal Defender Reynaldo A. Aligada appeared on behalf of Defendant Rashad Arthur Russell.

1

The Court heard testimony from Officer Adam Lepinski of the Minneapolis Police Department, who is also a Task Force Officer with the Bureau of Alcohol, Tobacco, Firearms and Explosives. (Tr. 8, ECF No. 21.) The Court also heard testimony from Officer Mark Kaspszak of the Minneapolis Police Department. (Tr. 31.)

Post-hearing briefing is now complete and these motions are ripe for a determination by the Court.

## I.

Based upon the file and documents contained therein, along with the testimony presented, the undersigned Magistrate Judge makes the following:

### FINDINGS

In early January 2015, a confidential informant ("CI") reached out to Officer Lepinski regarding Defendant. (Tr. 8, 20.) Officer Lepinski had worked with the CI "several times in the past," and the CI's information had led to the recovery of firearms and narcotics and ultimately criminal convictions. (Tr. 9.) The CI told Officer Lepinski that the CI had recently observed Defendant in possession of firearms multiple times. (Tr. 9; *see* Tr. 20, 21.) Officer Lepinski was familiar with Defendant because of Defendant's suspected membership in the Bogus Boys gang, a street gang whose activities include possessing firearms illegally, selling illegal controlled substances, and violent crimes involving firearms. (Tr. 8, 9.) Officer Lepinski also knew that Defendant's criminal history prohibited him from possessing a firearm. (Tr. 8-9.)

Around 6:00 p.m. on January 22, the CI contacted Officer Lepinski again. (Tr. 10, 16, 20, 21.) The CI informed Officer Lepinski that Defendant would be riding around in

a darker-colored sedan that evening in the Camden area of North Minneapolis and would be armed with a "greenish-colored handgun." (Tr. 10, 21.) Officer Lepinski relayed the information to other officers and set out in an unmarked vehicle to locate Defendant. (Tr. 10.) Officer Lepinski also requested the assistance of uniformed officers and marked squad cars. (Tr. 10; *see* Tr. 31-32.)

In the next 30 minutes or so, Officer Lepinski received additional information from the CI—the sedan's license plate—and law enforcement located the sedan matching the CI's description. (Tr. 16, 17, 21-22; *see* Tr. 35.) Defendant was spotted in the sedan's front passenger seat by an unmarked squad in the 4700 block of Bryant Avenue North. (Tr. 11, 23; *see* Tr. 22.) Several squads began to follow the sedan. (Tr. 11.)

The sedan "ultimately made a big circle," traveling eastbound on 47th Avenue North to Lyndale Avenue North, southbound on Lyndale Avenue North to 44th Avenue North, westbound on 44th Avenue North, and ending up approximately three blocks south back on Bryant Avenue North. (Tr. 12, 28.) Officer Lepinski testified that this area is within the Camden neighborhood. (Tr. 17-18.) At the intersection of 47th Avenue North and Lyndale Avenue North, the sedan rolled through a stop sign. (Tr. 13, 16.) The sedan's unusual direction changes indicated to law enforcement that their surveillance may have been spotted. (Tr. 13; *see* Tr. 28.) Shortly after returning to Bryant Avenue North, the sedan pulled over on its own without being signaled by law enforcement. (Tr. 12, 13, 28; *see* Tr. 16.) In total, the sedan was followed for approximately three or four minutes. (Tr. 16, 22.)

After the sedan pulled over, Defendant exited the vehicle from the passenger side and began walking to a nearby residence. (Tr. 12, 13, 32, 36; *see* Tr. 18, 23.) Uniformed officers in marked squads arrived and detained Defendant. (Tr. 14, 32; *see* Tr. 23.) Officer Lepinski had previously informed these officers of Defendant's possible gang affiliation, criminal history, and alleged possession of a firearm. (Tr. 14; *see* Tr. 35.) Uniformed officers patted Defendant down for safety concerns and recovered a glove, currency, cell phones, and a small bag of marijuana. (Tr. 14, 19, 30; *see* Tr. 23.)

Meanwhile, other officers began searching the area nearby to make sure that Defendant did not drop any weapons or contraband as he walked away from the vehicle. (Tr. 15.) Other officers detained the female driver. (Tr. 15; *see* Tr. 26, 33.) Officers also searched the sedan itself. (Tr. 15.)

After stopping the sedan, it was discovered that the sedan was a rental vehicle. (Tr. 17.) The rental agreement had been signed by Kayla Hoff. (Tr. 18; *see* Tr. 25, 26.) Hoff and Defendant have a romantic relationship. (Tr. 25.) Defendant's name did not appear on the rental documents and Defendant did not have any rental documents on his person. (Tr. 19.) Defendant did not have the keys to the sedan. (Tr. 19.) The driver told officers that Defendant had asked her to drive the sedan. (Tr. 26.)

Upon searching the sedan, officers found a firearm underneath the carpeting of the floorboard on the passenger side where Defendant had been seated. (Tr. 18, 24, 27.) Officer Lepinski was informed that the firearm had been located, and he photographed and recovered the firearm. (Tr. 24; *see* Tr. 15.) Officers also found the "remainder of a marijuana cigarette," or "roach," in the sedan's ashtray. (Tr. 19.) Defendant admitted to

4

Officer Lepinski that he had been smoking marijuana in the vehicle a couple of hours ago. (Tr. 19.)

Defendant was arrested and taken to the station. (Tr. 29.) After giving Defendant a *Miranda* warning, Officer Lepinski obtained a DNA sample from Defendant while taking his statement. (Tr. 29.)

Officer Kaspszak testified that, on January 22, he was asked to assist with the recovery of the alleged firearm. (Tr. 31; *see* Tr. 35.) Officer Kaspszak was one of the uniformed officers in a marked squad. (Tr. 32.) Officer Kaspszak was in the second marked squad to arrive and focused on the driver. (Tr. 32; *see* Tr. 36.) He was parked approximately one-car length behind the first squad, the officers detaining Defendant. (Tr. 32, 36.) Officer Kaspszak went over to the sedan and opened the driver's door. (Tr. 32-33, 36.) For safety reasons, Officer Kaspszak wanted to make sure that no one else in the vehicle had a firearm. (Tr. 33.) Upon opening the door, Officer Kaspszak "smelled the strong odor of burnt marijuana." (Tr. 33.) Officer Kaspszak asked the driver to exit the sedan, patted her down, placed her in handcuffs, and put her in the backseat of his squad. (Tr. 33, 34; *see* Tr. 37.)

## II.

Based upon the foregoing Findings, the undersigned makes the following:

### CONCLUSIONS OF LAW

Defendant argues that law enforcement violated his Fourth Amendment rights by patting him down and searching the sedan. (Def.'s Mem. in Supp. at 1, ECF No. 23.) Defendant asserts that the officers did not have probable cause to search the sedan and

therefore needed a warrant. (Def.'s Mem. in Supp. at 7-9.) Defendant seeks the suppression of all "items seized, including a firearm located in the [sedan], and items taken from his person," as well as "any statements he made as a result of the stop and a known DNA sample later taken from his person." (Def.'s Mem. in Supp. at 1.)

The Fourth Amendment of the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend. IV. "A search occurs under the Fourth Amendment when . . 'the government violates a subjective expectation of privacy that society recognizes as reasonable.'" *Arzen v. Palmer*, 713 F.3d 369, 372 (8th Cir. 2013) (quoting *Kyllo v. United States*, 533 U.S. 27, 33 (2001)).

"'The touchstone of Fourth Amendment analysis is whether a person has a constitutionally protected reasonable expectation of privacy.'" *United States v. McIntyre*, 646 F.3d 1107, 1111 (8th Cir. 2011) (quoting *California v. Ciraolo*, 476 U.S. 207, 211 (1986)). "The Fourth Amendment generally requires the government to obtain a warrant before searching an area where an individual has a reasonable expectation of privacy." *United States v. Shafer*, 608 F.3d 1056, 1064 (8th Cir. 2010).

### A. Search of the Sedan

#### 1. Reasonable Expectation of Privacy

"It is well-established that 'Fourth Amendment rights are personal rights that may not be asserted vicariously.'" *United States v. Anguiano*, ___ F.3d ___, 2015 WL 4604960, at *4 (8th Cir. 2015) (quoting *United States v. Barragan*, 379 F.3d 524, 529 (8th Cir. 2004)); *accord United States v. Ruiz-Zarate*, 678 F.3d 683, 689 (8th Cir. 2012).

"[T]o challenge a search or seizure under the Fourth Amendment, the defendant must show that (1) he has a reasonable expectation of privacy in the areas searched or the items seized, and (2) society is prepared to accept the expectation of privacy as objectively reasonable." *Ruiz-Zarate*, 678 F.3d at 689 (quotation omitted); *accord Barragan*, 379 F.3d at 529 ("An individual asserting Fourth Amendment rights must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable." (quotation omitted)); *see United States v. Foster*, No. 10-cr-0049 (PJS/JJK), 763 F. Supp. 2d 1086, 1087 (D. Minn. 2011) ("As a general rule, a search cannot violate a person's Fourth Amendment rights unless the person has a reasonable expectation of privacy in the place searched—whether it be a home, a car, or somewhere else.").

"A defendant who fails to prove a sufficiently close connection to the relevant places or objects searched has no standing to claim that they were searched illegally." *Anguiano*, 2015 WL 4604960, at *4 (quotation omitted).

> "Factors relevant to the determination of standing include" the following:
>
>> ownership, possession and/or control of the area searched or item seized; historical use of the property or item; ability to regulate access; the totality of the circumstances surrounding the search; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of the expectation of privacy considering the specific facts of the case.

*Id.* at *4 (quoting *United States v. Gomez*, 16 F.3d 254, 256 (8th Cir. 1994)). "Generally, a mere passenger does not have standing to challenge a vehicle search where he has 'neither a property nor possessory interest in the automobile.'" *Id.* (quoting *Rakas v.*

7

*Illinois*, 439 U.S. 128, 148 (1978)); *accord United States v. Guzman*, 454 Fed. App'x 531, 534 (8th Cir. 2012) (per curiam); *United States v. Crippen*, 627 F.3d 1056, 1063 (8th Cir. 2010); *Barragan*, 379 F.3d at 530.

The Government asserts that Defendant lacks standing to challenge the search of the sedan because he "has no reasonable expectation of privacy in a vehicle he was riding in as a passenger" due to the absence of "any possessory or ownership interest over the vehicle." (Gov't's Resp. at 4, ECF No. 24.) The Government asserts that Defendant "was merely the passenger in a rental vehicle rented by someone else, and being driven by yet someone else. He is twice removed from the rental of the vehicle." (Gov't's Resp. at 5.)

While recognizing the "general rule [that] a person has no reasonable expectation of privacy in an automobile belonging to another," Defendant contends that, under the specific facts of this case, he has standing to challenge the search of the sedan. (Def.'s Mem. in Supp. at 5.) Defendant points to his "close relationship" with the woman who rented the sedan; the fact that "there was no indication that [Defendant] was in the vehicle without her permission"; and the driver's statement that Defendant had asked her to drive the sedan. (Def.'s Mem. in Supp. at 6.)

Defendant's standing is an interesting and likely close question in this case given the evidence in the record. The Eighth Circuit has held that "an unauthorized driver of a rental vehicle may have a legitimate expectation of privacy in the vehicle for Fourth Amendment purposes if he is able to establish that the authorized renter/driver gave him permission to drive the vehicle." *United States v. Mincey*, 321 Fed. App'x 233, 240 (4th

Cir. 2008) (citing *United States v. Best*, 135 F.3d 1223 (8th Cir. 1998); *United States v. Muhammad*, 58 F.3d 353 (8th Cir. 1995) (per curiam)). *But see United States v. Lumpkins*, No. 11-CR-0054-W-HFS, 2011 WL 3321310, at *1 n.1 (W.D. Mo. Aug. 2, 2011) (recognizing *Best* as binding precedent while noting "[t]he considerable weight of authority among the Circuits favors the Government when a search is challenged by a driver of a car who is not authorized by the lessor, even though the driver does have permission from the lessee" (citing *United States v. Kennedy*, 638 F.3d 159 (3rd Cir. 2011))).

Assuming for purposes of this motion without deciding that Defendant does have standing to challenge the search of the sedan, the Court concludes, for the reasons that follow, there was probable cause to search the sedan.

### 2. Probable Cause

"'[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specially established and well-delineated exceptions.'" *United States v. Vore*, 743 F.3d 1175, 1179 (8th Cir. 2014) (alteration in original) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). "[T]he 'automobile exception' permits the warrantless search of a vehicle if the police 'had probable cause to believe the vehicle contained contraband or other evidence of a crime before the search began.'" *Id.* (quoting *United States v. Wells*, 347 F.3d 280, 287 (8th Cir. 2003)); *accord United States v. Hambrick*, 630 F.3d 742, 747 (8th Cir. 2011). "'Probable cause sufficient to justify a search exists where, in the totality of the circumstances, there is a fair probability that contraband or

9

evidence of a crime will be found in a particular place.'" *Vore*, 743 F.3d at 1179 (quoting *United States v. Kennedy*, 427 F.3d 1136, 1141 (8th Cir. 2005)); *see Hambrick*, 630 F.3d at 747. "In making the probable-cause determination, [courts] 'apply a common sense approach and consider all relevant circumstances.'" *Vore*, 743 F.3d at 1179 (quoting *Kennedy*, 427 F.3d at 1141).

Defendant argues that there was no probable cause to believe that the sedan contained contraband or other evidence of a crime because "there were few specific, corroborated facts showing that the [CI's] report to [Officer] Lepinski was reliable." (Def.'s Mem. in Supp. at 8-9.) "To support a probable cause determination, officers may rely on an informant's tip if the informant has provided reliable information in the past or if his tip is independently corroborated." *Hambrick*, 630 F.3d at 747; *accord United States v. O'Dell*, 766 F.3d 870, 874 (8th Cir. 2014) ("Information may be sufficiently reliable to support a probable cause finding if the person supplying the information has a track record of supplying reliable information, or if it is corroborated by independent evidence." (quotation omitted)). "The core question in assessing probable cause based upon information supplied by an informant is whether the information is reliable." *O'Dell*, 766 F.3d at 874 (quotation omitted). "It is well established that even the corroboration of minor, innocent details can suffice to establish probable cause." *Id.* (quotation omitted).

Defendant argues that "[t]he [CI] generally described the [sedan] and the neighborhood in which the [sedan] was eventually located, but there were no additional verified facts" and "[w]hether the [CI] had provided verified information in the past is a

less important factor . . . ." (Def.'s Mem. in Supp. at 9.) The Government contends that the CI had a history of providing reliable information and "[t]he information the [CI] provided [here] was also specific and corroborated, including the description of the firearm[;] the area in which . . . Defendant could be found; the type of car he was in; and the [sedan's] license plate." (Gov't's Resp. at 6-7.)

*Hambrick* is instructive in this case. In *Hambrick*, a confidential informant provided a tip to law enforcement that Hambrick was selling cocaine. 630 F.3d at 744. "The informant was well known to law enforcement and had provided accurate information in the past which led to three narcotics seizures." *Id.* The informant stated that he had "personally witnessed" Hambrick in possession of cocaine and seen him "distribute it to others." *Id.* "One week later, the informant notified [law enforcement] that Hambrick was en route from Chicago, Illinois, to the 700 block of Pershing Avenue in Davenport, Iowa, and he was in possession of crack cocaine." *Id.* "The informant indicated Hambrick would be driving a dark-colored or black Monte Carlo with Illinois license plates and a missing gas-tank door." *Id.*

Shortly thereafter, law enforcement spotted a vehicle matching the informant's description in the location described. *Id.* The driver, Hambrick, was alone. *Id.* He parked, "briefly entered a residence on Pershing Avenue," and returned to the vehicle. *Id.* Law enforcement followed Hambrick and subsequently stopped the vehicle after confirming that Hambrick's license was suspended. *Id.* While Hambrick was being arrested for driving under suspension, officers searched the vehicle. *Id.* Officers found marijuana residue on the floorboard and a K-9 officer discovered "a digital scale covered

in cocaine residue in the trunk." *Id.* at 744-45. Hambrick was subsequently searched at the police station and crack cocaine was recovered from his person. *Id.* at 745.

Hambrick challenged, among other things, the search of his vehicle. *Id.* at 746-47. The Eighth Circuit held that, under the automobile exception, there was probable cause to search "Hambrick's vehicle because the officers reasonably believed a fair probability existed that drugs would be found in the vehicle" based on the informant's tip. *Id.* at 747. The Eighth Circuit reasoned:

> [T]he informant was known to the officers as a reliable source of information and he had provided reliable information in three prior narcotics seizures. The informant supplied detailed information regarding the make, model, year, and unique characteristics of Hambrick's vehicle, and he provided the precise time and address of Hambrick's stop. This information was verified by officers upon Hambrick's arrival.

*Id.*

Here, too, the CI was known by Officer Lepinski to be a reliable source of information as Officer Lepinski had worked with the CI "several times in the past," which led to the recovery of firearms and narcotics and ultimately criminal convictions. *See id.*; *United States v. Harris*, 557 F.3d 938, 940-41 (8th Cir. 2009) ("informant had previously provided information that led to an arrest"); *cf. United States v. Rosas*, No. 11-cr-188 (RHK/SER), 2011 WL 7046028, at *9 (D. Minn. Nov. 23, 2011) (informant's tip regarding defendant's possession of gun provided only reasonable articulable suspicion of possession rather than probable cause where "[t]he record lacks information as to whether the tipster provided reliable information in the past, had personal knowledge of

[defendant's] gun possession, or made statements against his or her penal interest"), *report and recommendation adopted in part*, 2012 WL 124970 (D. Minn. Jan. 17, 2012).

The CI's information was also based on personal knowledge as the CI had recently observed Defendant in possession of a firearm multiple times and stated that Defendant would be in possession of a "greenish-colored handgun." "[T]here are indicia of reliability in 'the richness and detail of a first[-]hand observation'" *United States. v. Buchanan*, 574 F.3d 554, 561 (8th Cir. 2009) (quoting *United States v. Jackson*, 898 F.2d 79, 81 (8th Cir. 1990)); *see Harris*, 557 F.3d at 940 (informant had personally seen drugs inside of defendant's apartment); *cf. Rosas*, 2011 WL 7046028, at *9. In addition, the CI provided detailed information about the vehicle Defendant would be in, including the type (sedan), color (darker-colored), and license plate. *See Hambrick*, 630 F.3d at 747. The CI further stated that the vehicle would be located in a particular Minneapolis neighborhood that evening. *See id.* Shortly thereafter, Defendant was located in a vehicle matching the CI's description in the particular area the CI stated that the Defendant would be. Thus, not only did the CI have a track record of providing reliable information, the information the CI provided in this case "was verified by the officers upon [Defendant's] arrival." *Id.*

Accordingly, the Court concludes that the information provided by the CI was sufficiently reliable based on the CI's history of supplying reliable information and the officers' ability to corroborate certain details of the tip. *See O'Dell*, 766 F.3d at 874; *Hambrick*, 630 F.3d at 747; *Harris*, 557 F.3d at 940-41. Based on the totality of the

circumstances, a fair probability existed that a firearm would be found in the sedan and, therefore, the officers had probable cause to search the sedan.[1]

## B. Pat Down of Defendant

Defendant also appears to be arguing that the officers were not justified in detaining him and patting him down after he exited the sedan. (*See* Def.'s Mem. in Supp. at 1, 3, 8, 9-10.) Defendant asserts that he "did not make an attempt to flee and was simply walking toward a house." (Def.'s Mem. in Supp. at 8.)

"An officer may, consistent with the Fourth Amendment[,] conduct a brief investigatory stop when the officer has reasonable articulable suspicion that criminal activity is afoot."[2] *United States v. Cotter*, 701 F.3d 544, 547 (8th Cir. 2012) (quotation omitted).

> In addition, if the officer reasonably believes the person with whom he is dealing is armed and dangerous, he is permitted to conduct a protective search of the person's outer clothing, and any weapons seized as a result of such a search "may be properly introduced in evidence against the person from whom they were taken."

---

[1] Because the Court concludes that the officers had probable cause to search the sedan based on the CI's information, the Court does not reach the Government's alternative argument that the smell of marijuana provided independent probable cause to search the sedan. (Gov't's Resp. at 7.) Similarly, the Court need not address Defendant's argument that he did not intend to relinquish control of the vehicle by walking away. (Def.'s Mem. in Supp. at 6-7.)

[2] "An officer's observation of a traffic violation, however, minor, gives the officer probable cause to stop a vehicle, even if the officer would have ignored the violation but for a suspicion that greater crimes are afoot." *Barragan*, 379 F.3d at 528 (quotation omitted). This case is somewhat unusual in that the sedan pulled over on its own accord before officers were able to effectuate a traffic stop based on the sedan's failure to come to a complete stop at a stop sign. Defendant asserts that "the alleged traffic violation had occurred blocks prior" and "[h]ad the traffic violation necessitated a stop, there was no reason to wait an additional six blocks, as it could have happened immediately." (Def.'s Mem. in Supp. at 8.) First, mere minutes passed between when the traffic violation was observed and the sedan stopped. Second, "subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." *United States v. Gunnell*, 775 F.3d 1079, 1083 (8th Cir. 2015) (quotation omitted). "Once an officer has probable cause, the stop is objectively reasonable and any ulterior motivation on the officer's part is irrelevant. Similarly, it is irrelevant that the officer would have ignored the violation but for his ulterior motive." *Id.* (quotation and citation omitted).

*Id.* (quoting *Terry v. Ohio*, 392 U.S. 1, 30-31 (1968)); *accord United States v. Preston*, 685 F.3d 685, 689 (8th Cir. 2012) ("There is an exception to the warrant requirement that permits a limited search for a weapon if there is a reasonable suspicion that the suspect is armed and poses a danger to officers or others." (citing *Terry*, 392 U.S. at 29)).

"Police officers may perform a pat-down search of a driver and passenger upon reasonable suspicion that they may be armed and dangerous." *Crippen*, 627 F.3d at 1063. "In determining whether reasonable suspicion exists, [courts] consider the totality of the circumstances in light of the officers' experience and specialized training." *Preston*, 685 F.3d at 689 (quotation omitted). "There is no neat set of legal rules that governs the determination whether the police had reasonable suspicion." *United States v. Woods*, 747 F.3d 552, 556 (8th Cir. 2014) (quotation omitted). Courts "examine the facts collectively rather than asking if each fact individually establishes reasonable suspicion." *Preston*, 685 F.3d at 690.

Officers need not "be certain that the suspect was armed." *United States v. Horton*, 611 F.3d 936, 941 (8th Cir. 2010); *accord Crippen*, 627 F.3d at 1063. "[A] pat-down is permissible if a 'reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.'" *Horton*, 611 F.3d at 941 (quoting *Terry*, 392 U.S. at 27); *accord Crippen*, 627 F.3d at 1063. "Reasonable articulable suspicion for a *Terry* stop requires less than probable cause of criminal activity, but the suspicion cannot be based on an inarticulate hunch." *Horton*, 611 F.3d at 940 (quotation omitted). Where officers are working together "and there exists some

degree of communication between [them], [courts] impute the knowledge of one officer to the other officers." *United States v. Aguilera*, 625 F.3d 482, 486 (8th Cir. 2010).

Defendant was known to law enforcement based on his suspected membership in a gang known to be associated with illegal firearms, drugs, and violent crime. The officers also knew Defendant's criminal history prevented him from possessing a firearm. As previously discussed, the officers received reliable information from the CI sufficient for there to be probable cause to believe that Defendant currently had a firearm in the sedan, including the CI's recent observations of Defendant with firearms. Once law enforcement located the sedan with Defendant as a passenger, the sedan engaged in an unusual driving pattern that caused officers to believe that the occupants knew they were being followed by law enforcement.

Based on the totality of the circumstances, the Court concludes that the officers had reasonable articulable suspicion to believe that criminal activity was afoot when they came upon Defendant exiting the sedan and walking away and reasonable suspicion that Defendant may be armed and pose a danger to themselves and others. The officers did not know whether the firearm was in the sedan or on Defendant's person at the time they approached him; their information was just that Defendant was armed. Moreover, allowing Defendant "to walk away unsearched [under the circumstances] would have posed a further threat to officer safety." *Preston*, 685 F.3d at 690. "[A] person who is allowed to walk away from a stop without a pat-down search could hypothetically turn around and shoot officers remaining at the scene." *Id.* A reasonably prudent officer in

these circumstances would be warranted in believing that the officer's safety and that of others was in danger.

### III.

Based upon the foregoing Findings and Conclusions, the undersigned Magistrate Judge makes the following:

### RECOMMENDATION

For the reasons set forth herein, **IT IS HEREBY RECOMMENDED** that Defendant's Pretrial Motion to Suppress Fruits of Unlawful Arrest and Search and Seizure (ECF No. 17) be **DENIED**.

Date: August   7   , 2015              *s/ Tony N. Leung*
                                       Tony N. Leung
                                       United States Magistrate Judge
                                       for the District of Minnesota

                                       *United States v. Russell*
                                       File No. 15-cr-128(1) (DWF/TNL)

### NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.